UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHELLE TALBOT et al.,<br><br>　　　　Plaintiffs,<br><br>　v.<br><br>UNITEDHEALTHCARE INSURANCE CO. et al.,<br><br>　　　　Defendants. | **UNDER SEAL**[1]<br><br>Case No. 2:23-cv-06137-SB-PVC<br><br>FINDINGS OF FACT AND CONCLUSIONS OF LAW |

　　　　In June 2021, Plaintiff Richelle Talbot received emergency medical care from Plaintiffs Emsurgcare and Emergency Surgical Assistant (Providers). Unsatisfied with the payment they received from Talbot's employer-sponsored health plan, Plaintiffs filed this action against Talbot's employer, the plan, and the plan's administrator, United Healthcare Services, Inc. (UHS). The Court dismissed Providers' quantum meruit claim, leaving only Talbot's claim to recover unpaid benefits under the Employee Retirement Income Security Act of 1974 (ERISA). The Court held a non-evidentiary bench trial on the administrative record on January 16, 2024. After evaluating the administrative record and

---

[1] Because some of the unredacted briefing and the administrative record are under seal, the Court has preliminarily sealed this order. The Court expects to unseal the order unless the parties show a compelling reason not to. Within seven days after entry of this order, the parties shall meet and confer and file a joint statement as to whether any part of this opinion should remain sealed. If the parties do not agree that the order should be unsealed in its entirety, they shall propose specific redactions and explain the need for each redaction sought.

considering the parties' written submissions and arguments at the bench trial, the Court issues the findings of fact and conclusions of law set forth below.[2]

## FINDINGS OF FACT

### Introduction

1. Defendant Pyure Brands LLC (Pyure) is the sponsor and administrator of Defendant Pyure Brands LLC Welfare Benefit Plan (the Plan), which provides health care coverage for Pyure's employees. Defendant United Healthcare Services, Inc. (UHS) is the claims administrator for the Plan.

2. Talbot was an employee of Pyure and a participant in the Plan at all relevant times.

3. On July 16, 2021, Talbot received an emergency laparoscopic appendectomy at Marina del Rey Hospital in Marina del Rey, California.

4. The appendectomy was performed by two doctors: Frazin Feizbakhsn, the primary surgeon, and Sean Rim, who served as an assistant surgeon.

5. The Marina del Rey Hospital was in the Plan's network. Providers, who employed Drs. Feizbakhsn and Rim, were not in the Plan's network.

### Plan Terms

6. The Summary Plan Description (SPD) describes the benefits provided to Plan participants like Talbot.

7. As explained in the SPD, UHS "is a private healthcare claims administrator" responsible for administering claims, but "it does not guarantee any Benefits." AR 5. Instead, Pyure "is solely responsible for paying Benefits described in this SPD." *Id*.; *see also* AR 7 (explaining to participants, "You and [Pyure] share in the cost of the Plan. Your contribution amount depends on the Plan you select and the family members you choose to enroll.").

8. As explained in the SPD, "[t]he role of the Claims Administrator is to handle the day-to-day administration of the Plan's coverage as directed by the Plan

---

[2] The characterization of a finding as one of "fact" or "law" is not controlling. To the extent that a finding is characterized as one of "law" but is more properly characterized as one of "fact" (or vice versa), substance shall prevail over form.

Administrator." AR 86.  As the claims administrator, UHS "processes claims for the Plan and provides appeal services." AR 88.

9. UHS has authority "to decide whether a treatment or supply is a Covered Health Service and how the Allowed Amounts will be determined and otherwise covered under the Plan." AR 10.  Along with Pyure, UHS also has "final authority to:  interpret Benefits under the Plan; interpret the other terms, conditions, limitation and exclusions of the Plan, including this SPD . . . ; and make factual determinations related to the Plan and its Benefits." AR 78.

10. Plan participants generally pay less for the same health care when they use an in-network provider (i.e., a provider who has contracted with UHS or its affiliates to provide services) than when they use an out-of-network provider. AR 10.  However, the SPD provides that "Emergency Health Care Services are always paid as Network Benefits.  Emergency Health Care Services provided by an out-of-Network provider will be reimbursed as set forth under Allowed Amounts as described in the Summary Plan Description." AR 13.

11. The amount to be paid by the Plan for emergency services provided by an out-of-network provider is explained in the SPD:

> **For Emergency Healthcare Services provided by an out-of-Network Provider**, the Allowed Amount is a rate agreed upon by the out-of-Network provider or determined based upon the higher of:
> 
> - The median amount negotiated with Network providers for the same service.
> 
> - 110% of the published rates allowed by the *Centers for Medicare and Medicaid Services (CMS)* for the same or similar service within the geographic market.
> 
> - The amount that would be paid under Medicare (part A or Part B of title XVIII of the Social Security Act, 42 U.S.C. 1395 et seq.) for the same service.

AR 90.

12. Pursuant to the UHS reimbursement policy for "Assistant-at-Surgery" claims, the standard reimbursement for eligible services is 16 percent of the allowable amount for the surgical procedure. AR 337. The policy states that "[t]his percentage is based on CMS." *Id.*

## Claim History

13. Following Talbot's surgery, Providers submitted three bills totaling $93,500 to UHS as the claims administrator for the Plan.

14. In Claim No. 0005943633-00-0040, Emsurgcare billed $45,000 for Dr. Feizbakhsn's services (the Surgeon Claim).

15. In Claim No. 0005943633-00-0042, Emergency Surgical Assistant billed $44,000 for Dr. Rim's services, using the modifier code for assistant surgeon claims (the Assistant Claim).

16. In Claim No. 0005943633-00-0041, Emsurgcare billed $4,500 for the hospital visit (Visit Claim).

17. On August 24, 2021, UHS, on behalf of the Plan, issued payment on each of the three claims, in amounts substantially less than requested. AR 256, 258, 267.[3] The Court discusses each claim separately below.

## The Surgeon Claim

18. UHS paid Emsurgcare $2,018.50 on the Surgeon Claim and disallowed $42,981.50. UHS's explanation of benefits (EOB) for the claim included a remark stating, "An out of network provider or facility provided these services. The claim was processed using your network benefits." AR 256.

19. In a letter to UHS dated September 30, 2021, Emsurgcare asserted that the denial of the Surgeon Claim "was arbitrarily and capriciously used to deny the Member's Medical Emergency benefit entitlement and is in direct conflict with plan documents. This determination is a clear violation of the Health Benefit Plan." AR 282. The letter asked UHS to respond with the entire administrative record if UHS disagreed and stated, "We expect our billed charges to be paid in full." AR 283.

---

[3] The Court cites to the unredacted administrative record (AR) filed under seal at Dkt. No. 54-1, using the pagination in the bottom right corner of each page.

20. UHS responded to this appeal on January 11, 2022. UHS's letter stated that a person not involved in the earlier decision had conducted a new review and concluded that the claims had been processed correctly and no further payment was due. AR 277. The letter included the following explanation:

> Richelle Talbot's plan allows reimbursement at either the Network benefit level or the Non-Network benefit level, depending on whether the provider is contracted with the UnitedHealthcare Core Network. Frazin Feizbakhsn MD was not a contracted provider with UnitedHealthcare Core Network on the date of service listed. However, the claims were not processed at the out-of-network benefit level.
>
> In order to provide a better benefit to our member, Frazin Feizbakhsn MD's charges have been reimbursed comparable to the network benefit level, subject to the allowed amount payable by the plan. The claim billed a total of $45,000.00 for services provided. The allowed amount of $2,018.50 is based on 110% of the fee Medicare allows for the same or similar services provided in the same geographical area. Of this amount $2,018.50 was paid to Emsurgcare on August 24, 2021 and $42,981.50 exceed the eligible expenses allowed by the plan. This is patient responsibility due to the exclusion of charges exceeding allowed amounts. The applicable plan language is enclosed for your review.

*Id*.

21. UHS attached to the letter an excerpt from the SPD that included the provision on rates for emergency health care services performed by an out-of-network provider, which is reproduced in paragraph 11 above. AR 280–81.

22. The administrative record does not contain any request by Talbot or Providers for further explanation of UHS's payment decision or any request to negotiate an agreed rate for the Surgeon Claim.

The Assistant Claim

23. UHS paid Emergency Surgical Assistants $322.96 on the Assistant Claim and disallowed $43,67.04. As with the Surgeon Claim, UHS's EOB included a remark stating, "An out of network provider or facility provided

these services. The claim was processed using your network benefits." AR 258.

24. The amount UHS allowed on the Assistant Claim ($322.96) is 16 percent of the amount UHS allowed on the Surgeon Claim ($2,018.50).

25. Although no written appeal of the Assistant Claim is contained in the administrative record, Providers evidently requested further review. In a December 31, 2021 letter, UHS wrote to Dr. Rim: "We received your request for further benefits review. After further review of the insured's United HealthCare Choice Plus network, it has been decided that this claim was processed correctly. The eligible amount is subject to Non-Network benefits outlined in the coverage document." AR 274.

26. The administrative record does not contain any request by Talbot or Providers for further explanation of UHS's payment decision or any request to negotiate an agreed rate for the Assistant Claim.

## The Visit Claim

27. UHS paid Emsurgcare $235.57 on the Visit Claim and disallowed $4,264.43. The EOB contained a remark stating, "You made the right choice in selecting a network facility. Because of this, the eligible charges have been processed at network benefit level." AR 267.

28. In an undated document, Emsurgcare disputed the payment, contending that the determination to pay only $235.57 on the claim was arbitrary and capricious and "in direct conflict with plan documents." AR 310. Emsurgcare asked UHS to "reprocess this claim using the benefits as stated in the member[']s plan" and stated: "Once this claim is processed correctly, **we expect an additional payment to be made to the provider**." *Id.* (emphasis in original).

29. On June 10, 2022, UHS sent a letter to Emsurgcare stating that it had completed an independent review and determined that the Visit Claim had been processed correctly. AR 305. In its header, the letter repeated the statement that the eligible charges had been "processed at the network benefit level." *Id.* In its body, the letter provided the following explanation:

> Richelle Talbot's plan allows reimbursement at either a network benefit level or a non-network benefit level, depending on whether the provider of service is contracted with

6

> UnitedHealthcare Choice Plus network. We verified Frazin Feizbakhsn, MD was not a contracted provider with UnitedHealthcare Choice Plus network on June 16, 2021 and we have verified the pricing is correct.
>
> Frazin Feizbakhsn, MD billed a total of $4,500 for which we priced the allowed [a]mount at $235.57 and was paid by the plan on October 12, 2021. The remaining balance of $4,264.43 exceeds the allowed amount by Richelle Talbot's plan. The sum of $4,264.43 would be the member's responsibility as the patient because it is not a covered expense as defined in the plan.

*Id.*

30. The June 10, 2022 letter mistakenly states that UHS considered the plan language and claims history of a different patient, Logan Patrick, in performing its review. *Id.* The remainder of the letter, including the caption, repeatedly references Richelle Talbot, along with the correct date of her procedure, the correct treating doctor, the correct amount billed, and the correct amount UHS had previously paid. Thus, it is clear that the references to Patrick are in error and that the letter refers to the Visit Claim.

31. The administrative record does not contain any request by Talbot or Providers for further explanation of UHS's payment decision or any request to negotiate an agreed rate for the Visit Claim.

## Litigation History

32. Plaintiffs filed this action in state court. At the time of removal, the operative pleading was the First Amended Complaint (FAC), which alleged claims for quantum meruit and non-payment of benefits under ERISA against United Healthcare Insurance Company (UHIC). Dkt. No. 1 at 11 of 26.[4]

33. UHIC removed the case based on federal-question jurisdiction in July 2023. Dkt. No. 1.

---

[4] The record before this Court does not appear to include the original complaint filed in state court.

34. In September 2023, Plaintiffs filed their Second Amended Complaint (SAC). Dkt. No. 17. The SAC named UHS instead of UHIC and also alleged Plaintiffs' claims against Pyure and the Plan.

35. UHS moved to dismiss the quantum meruit claim in the SAC. Dkt. No. 25. The Court granted the motion, finding that Plaintiffs had not adequately alleged that UHS was a health care service plan subject to the Knox-Keene Health Care Service Plan Act, which was a necessary premise of their claim. Dkt. No. 47. The Court granted Plaintiffs' request for leave to amend.

36. Plaintiffs filed their Third Amended Complaint (TAC)—the operative pleading—in November 2023. Dkt. No. 50. In Count 1, Providers realleged their quantum meruit claim against UHS only. In Count 2, Talbot alleged against all Defendants an ERISA claim under 29 U.S.C. § 1132(a)(1)(B) for failure to pay benefits owed under the Plan.

37. Like the corresponding claims in the FAC and SAC, the ERISA claim in the TAC alleges that Talbot "is entitled to recover ERISA benefits due and owing in an amount to be proven at trial." *Id*. ¶ 76. The TAC recites the SPD provision governing the amount owed for emergency services provided by out-of-network providers and alleges that Defendants did not attempt to negotiate with Providers in violation of their fiduciary obligation to do so. *Id*. ¶¶ 53–54. In connection with the ERISA claim, the prayer for relief in the TAC requests "expectation damages relating to [Talbot's] ERISA claim for benefits" and "a declaration that DEFENDANTS are obligated to pay plaintiffs all monies owed for services rendered." *Id*. at 15. The TAC does not allege that UHS failed to provide an adequate explanation for its payment decisions, nor does it request a further explanation.

38. UHS moved to dismiss Providers' quantum meruit claim, Dkt. No. 52, and the Court again granted the motion, Dkt. No. 116. The Court found that the plain terms of the SPD made clear that UHS was not a health care service plan subject to the Knox-Keene Act and that UHS did not receive a benefit from any underpayment of Providers' claims, as is required to prevail on a quantum meruit theory. Thus, only Talbot's ERISA claim remained for trial.

39. Meanwhile, UHS filed a Rule 52 motion, Dkt. No. 53-3, which Talbot opposed, Dkt. No. 66. The parties also filed proposed findings of fact and conclusions of law in anticipation of the bench trial, Dkt. Nos. 87-1, 89.

40. Talbot's primary argument in her briefing was that the Plan obligated Defendants to attempt to negotiate a payment amount with Providers and requested that the Court remand the matter and order UHS to negotiate with Providers.  Talbot's opposition brief also argued for the first time that UHS failed to adequately explain its decisions in violation of its obligation to communicate with Talbot.

41. The Court inquired as to whether these new arguments had been exhausted, and the parties filed supplemental briefs addressing the Court's questions about exhaustion.  Dkt. Nos. 119-1, 121.

42. Pyure and the Plan did not appear until the eve of trial, after they were properly served with the TAC.  Rather than file separate briefs, Pyure and the Plan joined in UHS's filings.  Dkt. Nos. 111, 117, 122.

43. The Court held a bench trial on the administrative record on January 16, 2024, and took the matter under submission.

## CONCLUSIONS OF LAW

### Legal Standard

1. ERISA permits Talbot, as a plan participant, to bring a civil action "to recover benefits due to [her] under the terms of [her] plan, to enforce [her] rights under the terms of the plan, or to clarify [her] rights to future benefits under the terms of the plan."  29 U.S.C. § 1132(a)(1)(B).

2. District courts reviewing a claim for benefits under § 1132(a)(1)(B) may do so by conducting a bench trial on the administrative record under Rule 52(a).  *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1094–95 (9th Cir. 1999) (en banc).  Under Rule 52, a court conducting a bench trial "must find the facts specially and state its conclusions of law separately."  Fed. R. Civ. P. 52(a)(1).

3. A plaintiff seeking benefits under § 1132(a)(1)(B) bears the burden of proving her entitlement to the benefits she seeks.  *Muniz v. Amec Const. Mgmt., Inc.*, 623 F.3d 1290, 1294 (9th Cir. 2010).

4. When a plan confers discretion on the defendant to determine eligibility for benefits or to construe the terms of the plan, courts review a challenge to the defendant's denial of benefits for abuse of discretion.  *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006) (en banc).

5. The Plan grants UHS discretion to interpret the Plan's terms and make decisions about eligibility for benefits. Thus, as Talbot concedes, Dkt. No. 89 at 3, the Court reviews UHS's payment decisions for abuse of discretion.

6. UHS does not fund the Plan or otherwise operate under a conflict of interest that would justify a more demanding review. *Cf. Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989) ("[I]f a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion.") (cleaned up).

7. Under the abuse of discretion standard for ERISA claims, which the Ninth Circuit "equate[s] . . . with 'arbitrary and capricious' review," the administrator's interpretation of plan language "is entitled to a high level of deference and will not be disturbed unless it is not grounded on *any* reasonable basis." *Tapley v. Locs. 302 & 612 of Int'l Union of Operating Engineers-Emps. Const. Indus. Ret. Plan*, 728 F.3d 1134, 1139 (9th Cir. 2013) (cleaned up).

8. An administrator's interpretation of the plan language may constitute an abuse of discretion in three ways: (1) if it clearly conflicts with the plain language of the plan, (2) if it renders nugatory other provisions of the plan, or (3) if it lacks any rational nexus to the primary purpose of the plan. *O'Rourke v. N. California Elec. Workers Pension Plan*, 934 F.3d 993, 1001 (9th Cir. 2019).

<u>Talbot's Claim for Benefits</u>

9. Talbot's ERISA claim for benefits alleges that she is "entitled to recover ERISA benefits due and owing in an amount to be proven at trial." Dkt. No. 50 ¶ 76.

10. Talbot has made no attempt to prove an amount of benefits to which she is entitled under the Plan. Indeed, when asked by the Court, Talbot's counsel has repeatedly stated that he does not know how much should be paid on Providers' claims.

11. Talbot has not met her burden to establish that she is entitled to further benefits under the Plan in any particular amount.

Alleged Duty to Negotiate

12. Talbot's principal argument is that the Plan imposed on UHS an obligation to negotiate with Providers on Talbot's behalf to limit Talbot's financial liability.

13. Talbot's argument is premised on her interpretation of the SPD's provision describing the amount to be paid for emergency services provided by out-of-network providers. As noted above, that provision states:

> **For Emergency Healthcare Services provided by an out-of-Network Provider**, the Allowed Amount is a rate agreed upon by the out-of-Network provider or determined based upon the higher of:
>
> - The median amount negotiated with Network providers for the same service.
>
> - 110% of the published rates allowed by the *Centers for Medicare and Medicaid Services (CMS)* for the same or similar service within the geographic market.
>
> - The amount that would be paid under Medicare (part A or Part B of title XVIII of the Social Security Act, 42 U.S.C. 1395 et seq.) for the same service.

AR 90.

14. Talbot reads this provision as requiring UHS in every instance to attempt to negotiate with out-of-network providers for an agreed rate and then, only if those negotiations are fruitless, to select the highest of the three remaining options.

15. The Court does not adopt Talbot's reading of the SPD's language. The SPD requires payment of "a rate agreed upon by the out-of-Network provider *or*" the highest of the three alternative measures. *Id*. (emphasis added). There is no affirmative requirement to negotiate. The language permits UHS to agree to a rate for services, but it does not require UHS to attempt to do so. In the absence of such agreement, UHS must pay the highest of the other three measures.

11

16.     The Court would adopt this interpretation of the SPD's language even on de novo review. UHS construes the SPD in the same manner, and its interpretation is certainly not an abuse of discretion. It does not conflict with the clear language of the SPD, render any provision nugatory, or lack a rational nexus to the purposes of the Plan.

17.     Talbot also relies on authorities supporting the general proposition that ERISA fiduciaries have an obligation to act in the interest of participants and beneficiaries.[5] 29 U.S.C. § 1104(a)(1). Talbot cites no authority, however, suggesting that a plan administrator has a fiduciary obligation to negotiate a higher payment simply because a negotiated payment would benefit the plan participant (who may be otherwise liable for billed charges not paid by the Plan). That participants would always prefer to have their bills paid in full does not impose on ERISA fiduciaries the obligation to pay bills in full (or to negotiate to pay higher amounts), particularly when the plan expressly permits payment at lower rates.

18.     In sum, the Plan did not impose on UHS any obligation to negotiate with Providers for higher payments, and Talbot is not entitled to a remand or other order requiring UHS to attempt to negotiate.

---

[5] In both her Rule 52 opposition and her proposed findings of fact and conclusions of law, Talbot quotes *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312 (2016), as stating that "[a] fiduciary, for instance, must discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries. . . ." Dkt. No. 66 at 3; Dkt. No. 89 at 4. While this purported quote accurately recounts part of ERISA's standard for the duty of prudence, *see* 29 U.S.C. § 1104(a)(1)(A)(i), the quoted language does not appear in *Gobeille*—at the cited page or otherwise. Talbot's misrepresentation of Supreme Court authority in two separate filings—which the Court assumes is due to carelessness rather than bad faith—is concerning, especially in light of the Court's repeated warnings to Plaintiffs' counsel in this case. *See, e.g.*, Dkt. No. 47 at 6 (recounting concerns about Plaintiff's counsel's handling of case and cautioning counsel to be more careful); Dkt. No. 70 at 1 (noting counsel's carelessness and repeated errors); Dkt. No. 78 at 1 (minutes of show cause hearing at which the Court imposed monetary sanction and "cautioned Mr. Stieglitz that further violations of the Court's orders are likely to result in additional sanctions and a referral to the State Bar"). Plaintiffs' counsel is once again admonished that his repeated carelessness in this action falls short of the standard expected of lawyers appearing before this Court.

19. Because Talbot's claim that UHS was obligated to negotiate fails on the merits, the Court does not decide whether it was adequately exhausted.

## Proper Payment of Claims

20. Talbot has not otherwise shown that any of the payments UHS made to Providers was improper under the Plan.

21. Talbot's arguments largely ignore the differences between the Surgeon Claim, Assistant Claim, and Visit Claim.  As to the Visit Claim, on which Talbot does not focus, it is undisputed that the Marina del Rey Hospital where Talbot was treated is a network facility.  The administrative record states that the claim was paid at the network benefit level, and Talbot points to no evidence suggesting otherwise.

22. The Surgeon Claim and Assistant Claim were for emergency services provided by out-of-network providers.  Because UHS did not have an agreed rate with Providers, it was obligated to pay the highest of (1) the median amount negotiated with network providers for the same service, (2) 110 percent of the published rates allowed by CMS for the same or similar service within the geographic market, and (3) the amount that would be paid under Medicare for the same service.

23. Defendants assert that the amount paid was 110 percent of the CMS rate, which was the highest of the three options.  They point to a computer-generated document that purportedly shows that their software selected $2,018.50 as the appropriate payment on the Surgeon Claim because it was higher than the median negotiated amount (which apparently was $941). AR 341.

24. The computer-generated document on which Defendants rely is consistent with Defendants' explanation, but its meaning is not clear from the face of the document.

25. Talbot does not contend that $2,018.50 is not 110 percent of the CMS rate, nor that either of the other payment metrics required payment of more than $2,018.50.  She contends, instead, that she does not know whether the paid amount is correct because UHS did not provide an adequate explanation.  She therefore requests remand for a further explanation.

26. UHS's correspondence as part of its administrative review is not a model of clarity.  In particular, Plaintiffs are correct that UHS's references to network

13

and non-network benefits are confusing. However, UHS did explain in connection with the Surgeon Claim that "[t]he allowed amount of $2,018.50 is based on 110% of the fee Medicare allows for the same or similar services provided in the same geographical area" and provided the relevant language from the SPD. AR 277. In the three pages of SPD provisions UHS provided with the letter, the only reference to 110 percent of the Medicare rate was in the relevant provision for emergency health care services provided by an out-of-network provider. AR 281–82. Thus, Providers had sufficient notice of the asserted basis for UHS's payment decision that they could have followed up to request clarification or further information about the other possible measures of payment.

27. Although it is not clear that Talbot adequately exhausted her appeal of the Assistant Claim (which the Court does not decide), UHS's payment on that claim was 16 percent of the amount paid on the Surgeon Claim. This rate is consistent with UHS's policy for assistant-at-surgery services, which is based on CMS rates. AR 337. Thus, to the extent the amount paid on the Surgeon Claim was proper, the amount paid on the Assistant Claim was also proper.

28. Had Plaintiffs challenged UHS's assertion that $2,018.50 was 110 percent of the CMS rate for the Surgeon Claim or asked about the median negotiated amount or the Medicare rates, UHS might have been obligated to provide more information. But the Court need not decide that issue because Plaintiffs did not ask for that information, either in the administrative process or in their pleadings in this action. Instead, Providers asserted in their administrative appeal that "[w]e expect our billed charges to be paid in full." AR 283. Thus, UHS had no reason to believe it was being asked for a further explanation of how 110 percent of the CMS rate was determined or how that number compared to the other possible payment measures.

29. None of the pleadings in this action, including the operative TAC, alleges a claim based on Defendants' failure to provide an adequate explanation of its payment. Nor does the TAC request additional information as a remedy.

30. Plaintiffs' arguments in this case have presented a moving target. Despite amending their pleadings three times, Plaintiffs never alleged an ERISA claim based on a failure to provide sufficient information. Instead, they consistently alleged entitlement to an amount of damages they would prove at trial. They then shifted to an argument that Defendants had a duty to negotiate payment with out-of-network providers. Finally, on the eve of

14

trial, when it became apparent after a hearing before the Court that their primary argument was unlikely to prevail, Talbot asked for a remand to require Defendants to further explain their payment decision—despite lacking any reason to believe that such explanation would result in an increased payment.

31. Talbot has not sought leave to amend her complaint yet again to include an ERISA claim based on an insufficient explanation, and the Court declines to grant such leave sua sponte after the conclusion of this case. *See Foman v. Davis*, 371 U.S. 178, 182 (1962) (noting that leave to amend may be denied for reasons including "undue delay, bad faith or dilatory motive on the part of the movant, [or] repeated failure to cure deficiencies by amendments previously allowed"); *Allen v. City of Beverly Hills*, 911 F.2d 367, 374 (9th Cir. 1990) (affirming denial of leave to file third amended complaint to add new theories where plaintiff provided no satisfactory explanation for his failure to fully develop his contentions earlier).

32. The parties dispute whether the Court has discretion to remand for Defendants to provide a further explanation for their decision. Defendants acknowledge that courts may do so under some circumstances but argue that to remand under the circumstances here would be error. *Compare Foote v. Beverly Hills Hotel & Bungalows Emp. Benefit Emp. Welfare Plan*, No. 2:20-CV-10573-SVW, 2021 WL 6536671, at *11 (C.D. Cal. Aug. 12, 2021) (remanding case for further proceedings after finding "an abuse of discretion based on procedural violations and insufficient explanation"), *with Snow v. Standard Ins. Co.*, 87 F.3d 327, 333 (9th Cir. 1996) (reversing district court's remand to ERISA administrator because "the district court should not have ordered the taking of more evidence; it should have decided the case one way or the other on the basis of the evidence in the record"), *overruled on other grounds by Kearney*, 175 F.3d 1084.

33. The Court does not decide whether it has discretion to remand, because even if it does, remand is not warranted here. Defense counsel represented on the record at trial that she has confirmed that $2,018.50 is 110 percent of the CMS rate and that it is the highest of the three possible measures for payment. Talbot admits that she has no contrary information, and she has not suggested any reason to doubt defense counsel's representation. Under these circumstances, remanding the case to require UHS to supplement the administrative record with a further explanation confirming that the Plan has paid what it owes would be a waste of resources, particularly where Plaintiffs failed to request such an explanation during the administrative

15

appeal process or in any of their three complaints in the record of this case. *See Duncan v. Minnesota Life Ins. Co.*, 845 F. App'x 392, 403 (6th Cir. 2021) (affirming decision not to remand ERISA case for further proceedings where there was no evidence outcome would change, such that remand would be "useless formality").

34. On this record, the Court has no reason to doubt the accuracy of UHS's calculations of the payment amounts under the Plan. Talbot has not met her burden to show that the Plan underpaid the Providers' claims, and her request for a remand to obtain more information is outside the scope of the claims she alleged in this case.[6]

35. Accordingly, Talbot is not entitled to recover any further benefits on her claim under § 1132(a)(1)(B).

## DISPOSITION

In light of the above-stated findings of fact and conclusions of law, the Court finds that Talbot is not entitled to recover on her ERISA claim. Talbot's ERISA claim against all Defendants is therefore DISMISSED on the merits with prejudice.

A final judgment will be entered separately.

Date: February 16, 2024

                                    Stanley Blumenfeld, Jr.
                                    United States District Judge

---

[6] Because Talbot's arguments that UHS did not provide sufficient explanation for its payments are outside the scope of her claims in this case, the Court need not resolve the parties' disputes about whether exhaustion was required or whether the issues should be deemed exhausted.